857 So.2d 224 (2003)
Michael SMITH, Appellant,
v.
FLORIDA POWER & LIGHT CO., and FPL Group, Inc., Appellees.
No. 2D02-1883.
District Court of Appeal of Florida, Second District.
August 22, 2003.
Rehearing Denied October 22, 2003.
*226 Theodore C. Eastmoore and Alan W. Roddy of Matthews, Eastmoore, Hardy, Crauwels & Garcia, P.A., Sarasota, for Appellant.
Robert E. Boan of Florida Power & Light Co., Miami, and Ralph O. Anderson, Mark Hicks and Gary A. Magnarini of Hicks, Anderson & Kneale, P.A., Miami, for Appellee Florida Power & Light Co.
*227 No Appearance for Appellee FPL Group, Inc.
CANADY, Judge.
Michael Smith appeals the entry of a final summary judgment in favor of Florida Power & Light Co. (FPL) on a negligence claim against FPL by Smith. Because we conclude that the facts of the case presented by Smith do not establish the basis for imposing a legal duty on FPL to protect Smith from the injury he suffered, we affirm the final summary judgment in favor of FPL.

I. FACTS OF THE CASE
Smith's claim against FPL arose from injuries occasioned by an electrical shock he received at a construction site when power passed from an uninsulated overhead power transmission line through the boom of a crane while Smith was working below ground and touching the cable of the crane. Smith was working on the construction site as an employee of a general contractor which had entered into a contract with a municipality to install a culvert/drainage system under certain public streets within the municipality.
Prior to entering into the contract, the contractor participated in a prebid meeting attended by other prospective bidders and by an employee of FPL, who had previouslyat the request of the municipality identified the location of FPL's poles and overhead and underground lines in the area of the project. At the prebid meeting, the subject of FPL's overhead lines was discussed and the municipality took the position that the prospective bidders should include the cost of rerouting those lines if the bidder determined that they could not work around the lines. There was deposition testimony that FPL's representative stated that FPL would charge as much as $20,000 to relocate the power lines at the construction site.
The winning bidder, Smith's employer, determined that its employees could safely work around the overhead lines and, therefore, decided not to pay for the relocation of those lines. The contractor's representative testified that "we felt like we could do the job without having to encroach within ten feet," although "we did want FPL to take the lines down too." Applicable safety requirements called for maintaining a minimum clearance of ten feet between the overhead lines and any equipment that might be used around those lines. See 29 C.F.R. § 1910.333(c)(3)(iii)(A) (setting forth federal Occupational Safety and Health Act regulation requiring that "[a]ny vehicle or mechanical equipment capable of having parts of its structure elevated near energized overhead lines shall be operated so that a clearance of 10 ft. (305 cm) is maintained").
Subsequent to the award of the contract, a preconstruction meeting was held to discuss various issues, including the potential impact of the project on existing utilities. At this meeting, a representative of FPL once again identified its power lines in the area of the project. The minutes of the meeting reflect that the contractor "does not anticipate any difficulty regarding clearance from the overhead lines and they will hand excavate in the vicinity of the underground lines." The FPL representative who attended the preconstruction meeting testified in deposition that he had no knowledge concerning the "methodology of construction that the contractor planned to use," that he had no understanding regarding "how closely the construction company was going to be working to" the power lines at the project site, and that he had no knowledge that cranes were to be used in the project. The FPL representative further testified: "The lines *228 are visible. The lines were shown on the construction drawings. There was no contact between myself or the contractor indicating that there was any problem with clearances." Smith submitted no evidence contradicting the testimony of the FPL representative.
The evidence before the trial court was also uncontroverted that FPL's uninsulated overhead power lines at the project site complied with all applicable safety codes, rules, and ordinances regarding construction, location, and height. The lines were clearly visible and in plain view of the workers at the site, including the crane operator. There was testimony that the workers were aware the lines were energized, but Smith testified that he believed the power lines were not energized. Moreover, those responsible for the operation of the crane knew that a minimum ten-foot clearance from the energized lines had to be maintained. The operator of the crane himself testified that the crane bore placards regarding the ten-foot clearance requirement.
On the date of the accident causing Smith's injuries, the crane was being used to lift and set box culverts in a trench and to move the "tugger"a piece of equipment used to pull the box culverts together in the trench. Smith was underground in one of the culverts assisting in the placement of the tugger. Smith's last memory before suffering his injury was of holding the crane cable. As the operator of the crane attempted to move the tugger, the cable coming from the top of the crane's boom came too close to the energized power lines overhead. As a result, current from the lines flowed through the cable into Mr. Smith, causing him devastating injuries.
There was testimony that FPL vehicles visited or passed by the construction site during the construction project. An employee of the contractor testified that on one occasion an FPL vehicle came by the construction site at a time when the crane was present. According to his testimony, however, there was no work being done "in close proximity to the overhead power lines" and the boom of the crane was pointed away from the lines when the FPL vehicle was present.
In opposition to FPL's motion for summary judgment, Smith filed the affidavit of an electrical engineer expressing the opinion that "FPL could have avoided this accident" in at least three different ways: 1) by placing reusable sleeves or insulators on the power lines; 2) by opening switches on the power poles immediately adjacent to the project site; or 3) by switching power from the "outer line nearest the crane" to the middle line located on the power poles at the site. In addition, Smith presented evidence that FPL on occasion used rubber "eels" to protect FPL employees and others working in the vicinity of FPL's power lines.
Smith's complaint against FPL alleged that FPL owed Smith a duty to ensure that: "a. electricity did not flow from and/or through the power lines, b. the power lines were shielded, c. the power lines were properly secured, d. the flow of electricity was rerouted, e. the power lines were safe, and/or f. appropriate actions were taken regarding the power lines." FPL moved for summary judgment and argued that "there is no recognized duty which has been breached by [FPL], and that FPL's allegedly negligent conduct was not the proximate cause of the harm suffered by Smith." After conducting a hearing and considering the affidavit and deposition testimony filed by the parties, the trial court determined that there was no "genuine issue of material fact ... on the duty issue, given the apparently conceded *229 fact that nobody involved needed Florida Power & Light to do anything."

II. STANDARD OF REVIEW
A final order granting a motion for summary judgment is subject to de novo review. Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126 (Fla.2000). "When reviewing a summary judgment, we must view the facts in the light most favorable to the nonmoving party." Garden St. Iron & Metal, Inc. v. Tanner, 789 So.2d 1148, 1149 (Fla. 2d DCA 2001). In a negligence case, the de novo review of a summary judgment is guided by the principle that "[s]ummary judgments should be cautiously granted." Moore v. Morris, 475 So.2d 666, 668 (Fla. 1985). Summary judgment is only appropriate if the moving party has met the burden of conclusively proving the nonexistence of "genuine triable issues." Holl v. Talcott, 191 So.2d 40, 43 (Fla.1966).

III. ANALYSIS
A. The Framework for Establishing a Legal Duty
The starting point for our analysis of this case is the decision of the Florida Supreme Court in McCain v. Florida Power Corp., 593 So.2d 500 (Fla.1992), where the court provided a "restatement of the law of negligence," Whitt v. Silverman, 788 So.2d 210, 218 (Fla.2001), in the context of a case involving the issue of power company liability for injuries sustained from contact with an underground power cable. McCain is particularly pertinent here both because of the general principles it articulates concerning the duty element in tort actions and because of the fact pattern present in the case. Those general principles govern our analysis of the dispositive issue, while the facts of McCain stand in contrast to the facts of this case. Central to McCain's treatment of duty is the concept of "zone of risk"a concept earlier articulated by the supreme court in Stevens v. Jefferson, 436 So.2d 33 (Fla.1983), and Kaisner v. Kolb, 543 So.2d 732 (Fla.1989). Under the framework set forth by the supreme court, the zone of risk created by a defendant defines the scope of the defendant's legal duty and the scope of the zone of risk is in turn determined by the foreseeability of a risk of harm to others. "The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader `zone of risk' that poses a general threat of harm to others. See Kaisner, 543 So.2d at 735 (citing Stevens v. Jefferson, 436 So.2d 33, 35 (Fla.1983))." McCain, 593 So.2d at 502.
Foreseeability clearly is crucial in defining the scope of the general duty placed on every person to avoid negligent acts or omissions. Florida, like other jurisdictions, recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others. As we have stated:
Where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.

Kaisner, 543 So.2d at 735 (citing Stevens v. Jefferson, 436 So.2d at 35 (Fla.1983)) (emphasis added).
McCain, 593 So.2d at 503. The duty element "is a minimal threshold legal requirement for opening the courthouse doors." Id. at 502 (footnote omitted). The legal threshold for imposing a duty on a defendant is, however, crossed only when it is established that the defendant "more likely than not" created a foreseeable zone of risk. Id. at 503.
*230 This analytical frameworkwhere foreseeablity is crucialis premised on a recognition that duty is a relational concept. A duty is owed by a particular defendant to a particular plaintiff based on particular circumstances. The "`reasonable specific foreseeability of a general zone of risk to a given [p]laintiff is an objective test ... that recognizes that more is required than the mere general risk of injury that is concomitant to all human activity.'" Gath v. St. Lucie CountyFort Pierce Fire Dist., 640 So.2d 138, 140 (Fla. 4th DCA 1994) (Anstead, J., concurring) (quoting trial court order). In Palsgraf v. Long Island Railroad, 248 N.Y. 339, 162 N.E. 99 (1928), Justice Cardozo succinctly articulated the fundamental principles on which the framework in McCain is based:
[T]he orbit of the danger as disclosed to the eye of reasonable vigilance would be the orbit of the duty....
... The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension....
.... One who seeks redress at law ... must show that the act as to him had possibilities of danger so many and apparent as to entitle him to be protected against the doing of it....
Palsgraf, 162 N.E. at 100-01.
Foreseeability also plays a role in the analysis of the proximate cause element of a negligence claim. But the proximate cause foreseeability determination differs in important respects from the duty foreseeability determination. In the duty context, foreseeability is a question of the general threat of harm to others. In the proximate cause context, foreseeability focuses on "whether the specific injury [to the plaintiff] was genuinely foreseeable or merely an improbable freak." McCain, 593 So.2d at 504. The duty foreseeability issue is a legal question and thus is to be determined by the court; the proximate cause foreseeability issue is a fact question which ordinarily is to be determined by the trier of fact. Id.
B. Circumstances Where a Duty Is Imposed on a Power Company
The McCain court applied this framework to circumstances where the plaintiff was injured when "the blade of a mechanical trencher he was operating struck an underground [power company] electrical cable," after an employee of the power company had "marked those areas where it would be safe to use the trencher." Id. at 501. The supreme court concluded that the district court had erred in ordering the entry of a directed verdict in favor of the power company. On the issue of duty, the supreme court stated that the power company "clearly was under a duty to take reasonable actions to prevent the general type of injury that occurred here." Id. at 502.
Here, there can be no question but that [the power company] had the ability to foresee a zone of risk. By its very nature, power-generating equipment creates a zone of risk that encompasses all persons who foreseeably may come in contact with that equipment. The extensive precautionary measures taken by [the power company] show that it understood or should have understood the extent of the risk involved. The very fact that [the power company] marked the property for McCain itself recognizes that McCain would be within a zone of risk while operating the trencher.
While it is true that power companies are not insurers, they nevertheless must shoulder a greater-than-usual duty of care in proportion to the greater-than-usual *231 zone of risk associated with the business enterprise they have undertaken. Escambia County Elect. Light & Power Co. v. Sutherland, 61 Fla. 167, 55 So. 83 (1911). Electricity has unquestioned power to kill or maim. This is the precise reason the duty imposed upon power companies is a heavy one, because the risk defines the duty. Cobb v. Twitchell, 91 Fla. 539, 108 So. 186 (1926). Thus, if there is any general and foreseeable risk of injury through the transmission of electricity, the courts are not free to relieve the power company of this duty.
Id. at 504.
McCain is one of numerous Florida cases to reject a power company's assertion that it owed no duty to a plaintiff to protect against injuries sustained from contact with the power company's electrical transmission system. Those cases involve four broadand sometimes overlappingfact patterns which are discussed below. The division of the cases into these four categories is helpful because it illustrates the types of knowledge that have been found sufficient to impose a duty on a power company. Although some of the cases were decided before McCain's restatement of the law of negligence, their holdings with respect to the duty element are consistent with the principles set forth in McCain. These cases determine that the power company had a duty to protect a plaintiff against a particular risk where the power company had knowledge of the circumstances that posed a threat to the safety of the plaintiff and others. They turn on the power company's "ability to foresee a zone of risk," McCain, 593 So.2d at 504, and they impose a duty on the power company to protect the plaintiff when the power company "more likely than not" created a "foreseeable zone of risk." Id. at 503.
The first category of casesand perhaps the most common among the reported decisionsencompasses the cases in which the plaintiff's injury is sustained during the course of work being performed for the power company. These cases provide particularly compelling circumstances for the imposition of a duty on the power company, since the power company's knowledge of the work for which it has contracted to be performed on or in proximity to its power lines easily establishes that the risk to the individuals engaged in that work was foreseeable by the power company. See Fla. Power & Light Co. v. Brinson, 67 So.2d 407 (Fla.1953); Vanlandingham v. Fla. Power & Light Co., 154 Fla. 628, 18 So.2d 678 (1944); Keeley v. Fla. Power & Light Co., 610 So.2d 28 (Fla. 2d DCA 1992); Ahearn v. Fla. Power & Light Co., 129 So.2d 457 (Fla. 2d DCA 1961); Feagle v. Fla. Power & Light Co., 464 So.2d 1247 (Fla. 1st DCA 1985).
The second category covers those cases involving an alleged violation of an applicable safety code. These cases are subject to the general rule that if a statute, ordinance, or regulation is designed to protect the class of persons of which the plaintiff is a member against the type of injury which the plaintiff has suffered, then the defendant's violation of that statute, ordinance or regulation will be considered per se negligence. deJesus v. Seaboard Coast Line R.R. Co., 281 So.2d 198 (Fla.1973); Golden Shoreline Ltd. P'ship v. McGowan, 787 So.2d 109 (Fla. 2d DCA 2001); Concord Fla., Inc. v. Lewin, 341 So.2d 242 (Fla. 3d DCA 1976). If a safety code is applicable to the particular conduct of a power company and a violation of that code is asserted as the basis for imposing liability, the court will ordinarily be precluded from determining that the defendant had no duty to the plaintiff. The defendant power company is, as a matter *232 of law, ordinarily presumed to have knowledgeand as a practical matter will have knowledgeof the circumstances that bring the company within the ambit of the requirements of the safety code. Any injuries sustained as a consequence of a violation of a governing safety code will accordingly ordinarily be injuries falling within a zone of risk that was foreseeable by the defendant power company. See Pacheco v. Fla. Power & Light Co., 784 So.2d 1159 (Fla. 3d DCA 2001); Jones v. Fla. Power & Light Co., 552 So.2d 284 (Fla. 4th DCA 1989).
The third category of cases imposing a duty includes those in which the power company performs some action to protect against a known danger posed by its lines but does so in a manner that the plaintiff alleges was insufficient. In this category, the power company not only has knowledge of the particular circumstances which give rise to the risk but also specifically undertakes to protect against the risk in question. The power company's action, which purports to provide safety, itself creates a zone of risk that is foreseeable when it is inadequate to protect against harm to the plaintiff. McCain is a prime example of this category. See Pacheco, 784 So.2d 1159; Bell v. Fla. Power & Light Co., 106 So.2d 224 (Fla. 3d DCA 1958); see also Paszamant v. Ret. Accounts, Inc., 776 So.2d 1049, 1053 (Fla. 5th DCA 2001) (noting that in McCain power company "created a `zone of risk' when it created the `safe zone,'" and power company "had the duty to avoid negligent marking of an area when it knew [plaintiff] would be relying upon those marks to avoid injury").
The cases in the final category involve circumstances where the power company has knowledge of existing conditions or recurring activities in proximity to the company's lines that foreseeably create a risk of injury. If the power company knows that its lines are maintained in a location where conditions exist or a pattern of activity is ongoing that threatens the safety of persons such as the plaintiff, a duty will be imposed on the power company to protect the plaintiff's safety. Even in the absence of actual notice, the power company's responsibility to maintain its lines places it on constructive notice that those lines are located in proximity to more or less permanent conditions on the land or to recurring activities that pose a safety threat. See Duff v. Fla. Power & Light Co., 449 So.2d 843, 844 (Fla. 4th DCA 1984) (noting that propriety of maintenance of "uninsulated electrical wires... near residential property" turns on "their location in the particular setting, which includes the typical activities occurring there," and reversing summary judgment in favor of power company because "it cannot be said as a matter of law" that the "installation of an antenna[] [in a residential area] was unfor[e]seeable"); Fries v. Fla. Power & Light Co., 402 So.2d 1229, 1230 (Fla. 5th DCA 1981) (reversing summary judgment in favor of power company where there was disputed issue of material fact concerning, inter alia, "whether the defendant power company knew, or should have known, that in the vicinity where this accident is alleged to have occurred, the waters of [the river] are navigable and frequented by many sailing vessels"); see also Rist v. Fla. Power & Light Co., 254 So.2d 540, 542 (Fla.1971) (holding that plaintiff's allegations that power company "negligently maintained its uninsulated power line outside of its easement and dangerously close to the light standard," and "affidavits of experts that this was contrary to good engineering installation procedures" precluded summary judgment in favor of power company).
C. Limitations on the Scope of a Power Company's Duty
Although the cases acknowledge that power companies have a broad duty to *233 protect against harm threatened by their power lines, Florida law has also consistently recognized that power companies are not insurers against all harm that may be occasioned by contact with their power lines. See McCain, 593 So.2d at 504 (noting that "power companies are not insurers" although they "must shoulder a greater-than-usual duty of care"); Vanlandingham, 18 So.2d at 680 (stating that "[t]he law does not make defendant [power company] an insurer but only requires the exercise of a [degree] of care commensurate with the circumstances of the occasion"). The case law also has long specifically recognized that power companies do not have a generally applicable duty to insulate their power lines. See Reardon v. Fla. W. Coast Power Corp., 97 Fla. 314, 120 So. 842, 844 (1929) (holding that "[t]he fact that the wires of the power company at the place of the accident were uninsulated and elevated only 24 feet above the ground ... is not of itself a negligent act"); cf. Hardware Mut. Cas. Co. v. Tampa Elec. Co., 60 So.2d 179, 181 (Fla. 1952) (stating that "propriety of the use of exposed wires must depend on their location," but that there is "no clearer illustration of the need of insulation than of wires running through or within reach of bearing trees in a citrus grove").
The foreseeable zone of risk created by energized power lines is appropriately broad, but it is not limitless. Power companies are subject to a greater-than-usual duty of care, but the existence of a duty owed by the power company to a particular plaintiff depends on the power company's knowledge of a risk posed to the plaintiff by the company's power lines. Such a legal duty may only be imposed if the defendant power company more likely than not created a foreseeable zone of risk with respect to a particular plaintiff. To impose a duty on the defendant power company, however, it is not necessary to establish that "the specific injury [suffered by the plaintiff] was genuinely foreseeable." McCain, 593 So.2d at 504.
Not everyone who may be injured by contact with a power line is owed a duty by the power company to provide protection against injury. A threshold determination must be made that persons in the circumstances of a particular plaintiff were as a matter of law within a foreseeable zone of risk created by the defendant power company. The existence of uninsulated, energized power lines does not create a foreseeable zone of risk with respect to every potential plaintiff who may suffer injury by coming into contact with those lines. But see Pacheco, 784 So.2d at 1162 (stating that "[i]t is obvious that the danger of coming in contact with an electrified lineby whatever meansfalls squarely within the `zone of risk'").
The boundaries of duty in this context are illustrated by Rice v. Florida Power & Light Co., 363 So.2d 834 (Fla. 3d DCA 1978), which affirmed a summary judgment for the power company in a wrongful death case. The decedent in Rice was electrocuted when his model plane made contact with power lines and electrical current passed through the wires connecting the plane to the controls he was holding. The testimony of persons accompanying the victim indicated that, although they did not notice the overhead power lines prior to the accident, "the wires were clearly visible once one looked up a[t] them." Id. at 836. There was also "[u]ncontradicted evidence that the lines were placed in accordance with acceptable engineering practice." Id. at 837. The evidence further showed that "a model airplane attached to a hand control instrument ha[d] been flown over the field [where the accident occurred] at least once prior to the accident, but nothing in the record show[ed] *234 that [the power company] had any actual notice of that fact." Id. at 837. Additional evidence showed that kites and other model planes had previously been flown in the area, but there was an absence of evidence that the power company had actual knowledge of those activities. Id. at 838.
After noting the rule that power companies do not have a general duty to insulate their power lines, the Rice court focused on two circumstances: 1) the power company's lack of actual knowledge of dangerous activities; and 2) the proper location and installation of the lines. On the basis of those factors, the district court determined that the summary judgment in favor of the power company should be affirmed.
[W]e conclude that, as a matter of law, it would be beyond the bounds of reason to require [the power company] to foresee an occurrence such as that presented by the instant case. Had a clear view of the exposed lines not existed, or had [the power company] had actual notice that individuals were flying model airplanes attached to electrical conductors, the changed use of the underlying property might have been sufficiently persuasive to leave the questions of the existence of a duty and a breach of that duty for the resolution of a jury.
While endorsing the high degree of care to which a power company is held, we decline to impose a continuing duty to protect against any and all activity, however unlikely, occurring in the vicinity of lines which were initially located and installed in a reasonable manner. We hold that [the power company's] maintenance of its wires in the place and under the conditions described herein did not fall beneath the level of prudent foresight required of a supplier of electricity. Therefore, as a matter of law, appellee breached no duty owed the decedent.
Id. at 839 (emphasis supplied).
The Rice decision relied on Richmond v. Florida Power & Light Co., 58 So.2d 687 (Fla.1952), which rejected a claim that a power company had a duty to post warning signs or to place guards around its uninsulated power lines. In Richmond, the plaintiff argued that the power company had a duty to take those steps to protect against injuries suffered by someone in a residential area operating a box kite with a long copper wire which made contact with power lines that were in plain view. Affirming the summary judgment entered in favor of the power company, the Richmond court said:
The inherent danger of electrically energized wires is well known to all except those of tenderest age, but ... the need for successful distribution of so necessary a commodity cannot be defeated by requiring that every conceivable protection be afforded wherever wires carrying it may go, so that anyone who chances to come near may be saved from injury in anything he decides to do, however unpredictable. That would be one extreme. An illustration of the other would be the maintenance of exposed wires low to the ground where children [customarily] gathered.
Between the two would arise the situations where responsibility, or none, would be the question. From our study of the cases we are convinced that no set rule can be defined; that each must be determined according to the facts peculiar to it.
Id. at 688.
A trial court's determination that a power company had no duty to protect against the injuries sustained by a plaintiff has been affirmed in other cases where the power company did not have either actual *235 or constructive knowledge of a danger sufficient to establish that the company more likely than not created a foreseeable zone of risk. See Lopez v. Fla. Power & Light Co., 501 So.2d 1339, 1341 (Fla. 3d DCA 1987) (affirming directed verdict for power company due to absence of duty where plaintiff's expert "was unable to find a violation by [power company] of any applicable code, regulation, or standard of care," and "danger of working near electrical wires with a metal implement" should have been "manifest" to the deceased who made contact with overhead power line while reaching for avocados with sixteen-foot metal picker); Dudding v. Fla. Keys Elec. Coop. Ass'n, 105 So.2d 597, 598-99 (Fla. 3d DCA 1958) (affirming directed verdict for power company where after passing under bridge plaintiff raised aluminum outrigger of boat causing it to come into contact with "uninsulated high tension wires spanning" creek, and testimony of boat captain established that "there was no reason for the [plaintiff] to have raised the outrigger at the place that he did, and that it had been their custom not to raise the outriggers until they were a considerable distance away from the bridge," and court could not "conceive how the [defendant] could have reasonably foreseen the actions of the [plaintiff]").

IV. APPLICATION OF THE LAW
The plaintiff in the case under review argues that FPL's knowledge concerning the construction activities at the site where he was injured was sufficient to establish that he was in a foreseeable zone of risk created by FPL and thus sufficient to impose a duty on FPL to protect the plaintiff against injuries caused by contact with FPL's lines during the course of the construction work. There are two aspects to the plaintiff's argument concerning FPL's knowledge. One aspect focuses on FPL's knowledge that a construction project was to take place in the vicinity of its lines. It is, of course, undisputed that FPL had such knowledge. The plaintiff argues that this general knowledge that construction activities were to occur at a particular site in effect gave FPL notice of whatever activities might be undertakenincluding the unsafe use of a crane under FPL's power linesin connection with the construction job. The second aspect of the plaintiff's argument regarding FPL's knowledge focuses on the evidence that on at least one occasion an FPL truck was seen passing the construction site when a crane was at the site. We conclude that both aspects of the plaintiff's argument concerning FPL's knowledge are unpersuasive.
Under the principles set forth in McCain, and in light of the other case authority concerning the circumstances where a duty is imposed on a power company, we hold that a power company's general knowledge that a construction project will be undertaken in proximity to the power company's lines is not alone sufficient to establish that the power company more likely than not created a foreseeable zone of risk with respect to persons engaged in work on the construction project. Such general knowledge is, of course, distinguishable from the specific knowledge that a power company has concerning construction projects for which it has itself contracted. We further hold that the mere fact that a vehicle bearing the name of the power company was seen passing the construction site when a crane was at the site is not sufficient to establish that the power company had knowledge that the crane would be used under its power lines in an unsafe manneror in any other manner.
Acceptance of the plaintiff's contention concerning FPL's general knowledge *236 of the construction project would render power companies virtual insurers of all construction activities taking place in proximity to their power lines. It would impose a burden on power companies that goes beyond even the recognized "greater-than-usual duty of care" owed by power companies which is proportionate to the "greater-than-usual zone of risk associated with the business enterprise they have undertaken." McCain, 593 So.2d at 504. It would place an obligation on power companies to investigate every proposed or potential activity that might be undertaken in connection with any construction job of which the power company has notice, to evaluate the risk associated with those activities, and to take steps to protect against those risks. The burden associated with that obligation would be onerous and would exceed the burden that is properly borne for risks associated with a foreseeable zone of risk more likely than not created by the power company. A power company does not more likely than not create a foreseeable zone of risk with respect to every potential activity that may take place in proximity to its power lines during a construction job of which the company has notice. To impose a duty with respect to all such activities would extend the "orbit of the duty" far beyond the "orbit of the danger as disclosed to the eye of reasonable vigilance"even in the context of the greater-than-usual zone of risk associated with power lines. Palsgraf, 162 N.E. at 100.
The mere fact that a crane is located on a job site when a power company vehicle passes the site does not establish that the power company had actual knowledge that the crane would be used under the company's lines. And it is beyond the bounds of reason to charge a power company with constructive notice of every circumstance that might arise in connection with the use of equipment which is located on a job site when a power company vehicle happens to pass by. Again, the position urged by the plaintiff would place an obligation on a power company to conduct an investigation of the potential use of that equipment, evaluate the risk, and take steps to protect against the risk. All of this would flow from the bare circumstance that one of the power company's vehicles passed by the construction site when a crane was located there but when no work was being done "in close proximity to the overhead power lines" and the boom of the crane was pointed away from the lines. Whatever knowledge might be attributable to the power company based on one of the company's vehicles passing by the construction site under such circumstances is far too tenuous to support the legal conclusion that the company more likely than not created a foreseeable zone of risk associated with activities occurring at the construction site.
The circumstances of the case presented by the plaintiff are far different from the circumstances involved in the cases where a legal duty has been imposed on a power company to protect against injury caused by contact with the company's power lines. This case does not involve work performed for FPL. Here there is no allegation that FPL violated any safety code. There is no claim that FPL undertook to protect against a particular risk posed by its lines during the construction work and did so in an inadequate manner. And there is no evidence that FPL had knowledge of existing conditions or recurring activities in proximity to its lines that foreseeably created a risk of injury.
This is not a case where FPL had knowledge that a crane was being used under its lines in an unsafe manner. Indeed, this is not a case where FPL had *237 knowledge that a crane was being used under its lines in any manner. The plaintiff urges in effect that FPL "should have known" that the crane would be used under its energized lines and that this issue involves a fact question that cannot properly be resolved on summary judgment. In reviewing the summary judgment in favor of FPL, we accept as true all of the facts adduced by the plaintiff. Although the court, in determining whether the defendant owes the plaintiff a duty, "must make some inquiry into the factual allegations," the question of duty ultimately remains a legal issue. McCain, 593 So.2d at 502. The trial court correctly determined that as a matter of law the facts adduced by Smith are not sufficient to impose a duty on FPL. As a matter of law, it is not proper to push the concept of constructive noticeand the concept of zone of riskto the extreme advocated by the plaintiff. No Florida case has held that a power company had constructive notice of a dangerand therefore had a duty to protect against the dangerunder circumstances akin to those present in this case.

V. CONCLUSION
We decline to extend the scope of the traditional liability of power companies by imposing a duty on FPL under the circumstances presented by this case. Since FPL had no duty to protect against the injuries suffered by the plaintiff, the final summary judgment in favor of FPL is affirmed.
Affirmed.
NORTHCUTT and STRINGER, JJ., Concur.